AE

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | No. 04 CR 847 |
| ) | Judge Joan H. Lefkow |
| DENNIS LEIGH THOMPSON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Dennis Leigh Thompson ("Thompson") was indicted on charges of armed bank robbery, assault of bank employees by use of a dangerous weapon, and use of a firearm during a crime of violence. *See* 18 U.S.C. 21113(a) and (d); 18 U.S.C. § 924(c)(1)(A). On November 4, 2005, Thompson moved to suppress incriminating statements he made to government agents in the late evening hours of September 22, 2004 and the early morning hours of September 23, 2004. On January 19, 2006, the court granted Thompson's request for an evidentiary hearing. On March 2, 2006, this court held an evidentiary hearing concerning whether (1) Thompson was in custody at the time he made incriminating statements to government agents on September 22, 2004; (2) the incriminating statements were given voluntarily; and (3) the September 23, 2004 post-arrest interview with Thompson was distinct from the September 22, 2004 pre-arrest interview. For the reasons set forth below, Thompson's motion to quash his arrest and to suppress evidence is denied.

1

I.  **RELEVANT FACTS**[1]

A.  **The Bank Robbery and Initial Investigation Thereof**

On October 20, 1999, the LaSalle National Bank ("LNB") located at 4141 Venture Drive, Peru, Illinois, was robbed. During the robbery, the robber struck a teller with the butt of the robber's pistol. The robber then forced another teller to open the bank's vault, and the robber stole approximately $64,761 from the vault.

Shortly after the robbery, the Federal Bureau of Investigation ("FBI") began to suspect the involvement of an individual initially identified as David James Fowler ("Fowler"). The FBI's investigation led them to believe that Fowler was an alias used by Thompson. A subsequent comparison of the known fingerprints of Fowler and Thompson confirmed that Fowler and Thompson were indeed the same person. Though the FBI had this and other information linking Thompson to the robbery, nearly five years after the robbery no arrest warrant had yet been issued for either Fowler or Thompson.

B.  **The Agents' Entry into Thompson's Home and Subsequent Interview of Thompson**

On September 22, 2004, FBI Special Agents Timothy Eley ("Eley") and Dan Lee ("Lee") (together, "the Agents") arrived at Thompson's home for the purpose of interviewing him regarding the LNB robbery. The Agents either knocked on Thompson's door or rang the doorbell. Moments later, Thompson opened the door. The Agents identified themselves to Thompson, showed him their photo identification and asked him if he was willing to speak with them. Thompson consented to

---

[1] The court makes these findings of fact solely for the purpose of resolving Thompson's motion. These findings are based on the evidence presented at the March 2, 2006 hearing, at which FBI Agents Eley, Lee, Ray, and Delide testified, as well as Thompson. In addition, the court credits certain undisputed facts set forth in the parties' submissions concerning this motion.

2

an interview and invited the Agents into his home.

Upon entering Thompson's home, the Agents conducted a cursory visual inspection of Thompson's living room for issues concerning officer safety. Seeing none, the Agents began questioning Thompson regarding his true identity, his work history, and his whereabouts on October 20, 1999, as the parties remained standing in Thompson's living room. After Thompson answered that his true name was David James Fowler and denied any involvement in or knowledge of the LNB robbery, Agent Eley told Thompson that he believed that Thompson was lying. Agent Eley then showed Thompson an artist's sketch of the LNB robbery suspect and asked Thompson if he recognized the individual depicted in the sketch. After Thompson said no, Agent Eley confronted Thompson for the first time with his birth name, saying, "Dennis, it is you."

Until this point in the interview, the parties agree that the Agents had been non-confrontational and Thompson had been calm and cooperative. But once the Agents told Thompson that they knew that "Fowler" was an alias, they observed a "sharp decline" in Thompson's demeanor, as he appeared to "wilt like a flower" and, in Thompson's words, fall into a "mild state of shock." Thompson testified that at that point he realized the Agents knew his true identity and thus assumed that they also knew that he was a fugitive from a halfway house where he had been completing a sentence for a felony conviction.

From that point forward, the questioning took place with Thompson and the Agents seated in a triangle in Thompson's living room. According to Thompson's testimony, Thompson sat on his couch, while the Agents sat in chairs to the left and right of him approximately four or five feet away. While Agent Eley on occasion leaned forward, thereby reducing the distance between his face and Thompson's, Thompson acknowledges that Agent Eley never came within two feet of his face.

Likewise, though Agent Eley at times used his index finger to dramatize his accusations, there is no evidence or allegation that Agent Eley or Agent Lee ever physically touched Thompson in a threatening or intimidating manner.

Twice during the approximately three-hour interview, Thompson asked to move to another location in the apartment. On the first occasion, Thompson asked to get a glass of water from the kitchen. Later, Thompson asked to retrieve his Bible from a large, walk-in closet in the living room. Agent Eley agreed to the requests but followed Thompson on both occasions at a relatively close distance, approximately five to six feet, keeping Thompson in view at all times. Agent Eley testfied that he escorted Thompson to ensure his and Agent Lee's safety because a weapon had been used in the course of the LNB robbery.[2]

Although there is some dispute as to precisely what the Agents said and what topics were discussed over the next two to three hours leading up to Thompson's confession, the Agents concede that they told Thompson that criminal defendants who cooperate with the authorities receive lighter punishments and mentioned the possibility that Thompson might be released from jail on bond in order to dispose of his personal possessions. Finally, after Thompson read the Agents an inscription his mother had made in his Bible, the Agents read aloud passages from the Bible and counseled Thompson that the "the truth shall set you free." (John 8:32).

---

[2] At the evidentiary hearing, Thompson testified that before he was permitted to move into the kitchen, Agent Eley placed his hand on his firearm in a threatening manner. On cross-examination, however, Thompson was unable to recall specific details of the incident, including whether Agent Eley's gun was holstered on his right or on his left hip and whether Agent Eley gestured with his right or with his left hand. Moreover, Thompson has provided inconsistent testimony regarding those details he purports to recall. Specifically, in the affidavit submitted in support of his motion, Thompson avers that Agent Eley placed his hand "under his coat" when gesturing to his gun. During the evidentiary hearing, however, Thompson testified that Agent Eley placed his hand "over his coat." Since the Agents sharply deny ever signaling to their weapons, Thompson's vague and inconsistent testimony is insufficient to support his allegation. Accordingly, the court finds that the Agents did not motion to or otherwise identify their weapons at any point during the interview.

Three hours after the Agents began the interview, at approximately 10:00 p.m, Thompson confessed to the LNB robbery in detail. Agent Eley then prepared a written statement that Thompson reviewed for accuracy and signed.[3]

### C. The Agents' Exit out of Thompson's Home and the Subsequent Surveillance of Thompson

Shortly after signing the written statement confessing to the LNB robbery, the interrogation concluded and the Agents left Thompson's home.[4] The Agents retreated to a parking lot approximately one hundred yards down the street from Thompson's apartment building where they met two other agents who had been enlisted to monitor Thompson's building through the night. Following a brief discussion with the new agents, Agent Eley and Agent Lee left the stakeout

---

[3] The details surrounding Thompson's confession remain hazy and in considerable dispute. Thompson testified that in exchange for confessing to the LNB robbery, Agent Eley promised to allow Thompson to spend the night in his home and not to arrest him until the afternoon or early evening of September 23, 2004. Thompson's testimony is supported by the fact that the Agents did not arrest Thompson on the night of September 22, 2004 even though Thompson had just confessed to (1) committing armed bank robbery; (2) assaulting a victim-teller; (3) using an alias for nearly 20 years; and (4) being a fugitive from a halfway house in Iowa. But the Agents deny making any promises to Thompson in exchange for his statement and credibly explain that they chose not to arrest Thompson because they had not yet received authority to do so from the Assistant United States Attorney ("AUSA") assigned to the case; they wanted to first obtain an arrest warrant; and they had already placed FBI Agents near Thompson's home to ensure that he did not attempt to flee. The Agents' testimony is corroborated by the written statement Thompson reviewed and signed following his oral confession, which included acknowledgments that his statements were freely and voluntarily made and that he had received no promises in exchange for giving them. The court therefore finds that no promises were made to Thompson in exchange for his confession.

[4] Thompson testified that before departing the Agents instructed him not to leave his home and threatened that if he attempted to do so they would "come and find him." The Agents denied the allegation, testifying that they advised Thompson only that they would contact the AUSA assigned to the case and then notify Thompson shortly thereafter about how the government intended to proceed. If the Agents had made a deal with Thompson and told him that he was not free to leave, there would have been no reason for them to not also tell him that agents would be posted outside his home through the night. Similarly, there would have been no reason for the agents to have maintained a concealed position. Moreover, Thompson left his apartment the following morning, which suggests that he believed he was free to leave his apartment. With those considerations in mind, the court finds that the Agents did not instruct Thompson to remain in his home.

location.[5]

At some point during the night, around 3:00 a.m. or 4:00 a.m., Agent Ray and Agent Delide arrived separately to take over the surveillance of Thompson's building. As the sun began to rise sometime after 6:00 a.m., Agent Delide re-positioned himself in a parking lot adjacent to the rear exit of Thompson's building. Shortly thereafter, at around 7:30 a.m., Thompson exited the building wearing athletic clothing and was placed under arrest immediately.[6] The Agents and Thompson then returned to his apartment so that Thompson could changes clothes. While there, Thompson received a phone call from his sister. He spoke with her for approximately ten minutes.

### D. The Interrogation of Thompson at the FBI's Office

Following Thompson's phone conversation, Thompson was transported to the FBI's Rockford, Illinois office. Upon arriving, Thompson was placed in a small holding room and given coffee and juice. Agent Ray and Agent Delide then advised Thompson of his *Miranda* rights both orally and in writing. Thompson signed a written waiver of his *Miranda* rights and again confessed

---

[5]Thompson averred in his affidavit that he "looked out the back window on my neighbor's side, and saw two more agents talking to Agent Eley. These agents were wearing flak jackets and carrying guns." This averment is, of course, contradicted by the Agents' testimony that they were positioned in front of Thompson's building. But it is also contradicted by Thompson's testimony at the evidentiary hearing. There, Thompson testified that he did not become aware that Agents were posted outside his home until 4:00 a.m. when he heard voices coming from behind his building and then saw "several agents talking." Thompson could not have seen Agent Eley at 4:00 a.m. as he averred, because it is clear that Agent Eley did not participate in the surveillance during the early morning hours of September 23, 2004. Further, Thompson's testimony that he "saw a sawed off shotgun in the [Agent's] car" is incredible. Even if the parking lot was well lit, it is undisputed that Thompson had an awkward viewing angle, looking out a side window to the rear of the building. In fact, Thompson himself acknowledged that "it is very hard" to see to the rear of the building from his apartment and that he could only see "shadows" and "figures." Therefore, the court finds that Thompson was not aware that Agents were posted outside his home during the late evening hours of September 22, 2004 and the early morning hours of September 23, 2004.

[6]Thompson maintains that he initiated contact with Agent Delide, while Agent Delide testified that he approached Thompson after seeing him exit the building, placed him under arrest and called for Agent Ray, who was stationed in front of the building. The disagreement is ultimately immaterial and therefore the court elects not to resolve the factual dispute. Suffice it to say, however, that Thompson's testimony on this issue was questionable at best.

6

to using a firearm to rob the LNB.

Prior to their interrogation of Thompson at the Rockford FBI office, neither Agent Ray nor Agent Delide knew the details of the LNB robbery nor that Thompson had confessed to Agent Eley and Agent Lee the previous evening. Both Agents testified that they remained largely passive throughout much of the interview as Thompson calmly incriminated himself.

## II. DISCUSSION

Thompson moves to quash his arrest and suppress evidence on three grounds. First, Thompson argues that the court should suppress the statement he signed on September 22, 2004 in the presence of the Agents because the Agents failed to give him *Miranda* warnings at any time during their interview of him on that date. Thompson further argues that the court should exclude the September 23, 2004 signed statement from evidence because it was the result of the two-step interrogation process invalidated by the Supreme Court's decision in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601 (2004). Finally, Thompson contends that the September 22, 2004 and September 23, 2004 statements are inadmissible because they were not given voluntarily.

### A. Thompson Was Not In Custody During the September 22, 2004 In-Home Interview

Thompson first argues that the unwarned confession he made during his in-home interrogation by the Agents on September 22, 2004 is inadmissible because he was in "custody" and therefore entitled to *Miranda* warnings before making any statement.

It is well settled that "[t]he police are required to give [*Miranda*] warnings only 'where there has been such a restraint on a person's freedom as to render him in custody.'" *United States v. Bush*, 820 F.2d 858, 861 (7th Cir. 1987) (quoting *California v. Beheler*, 462 U.S. 1121, 1124, 103 S.Ct.

3517, 3519 (1983)). A suspect is in "custody" within the meaning of *Miranda* when he is either formally under arrest or there is a "'restraint on [his] freedom of movement' of the degree associated with a formal arrest." *Id.* Whether the degree of restraint is akin to formal arrest is determined under the totality of the circumstances as measured by how a reasonable person would have understood the situation. *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996). Factors that the court may consider in making this determination include "whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene." *Sprosty*, 79 F.3d at 641 (internal citations omitted). Moreover, the purpose and place of the interrogation are relevant to this determination. *United States v. Hocking*, 860 F.2d 769, 773 (7th Cir. 1988). In this case, the totality of the circumstances establishes that a reasonable person would have felt free to terminate the interview and ask the Agents to leave. Accordingly, Thompson was not in "custody" within the meaning of *Miranda*.

The fact that Thompson was questioned in the familiar surroundings of his home is not outcome determinative. *See Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095 (1969) (finding custody even though suspect was questioned within his own home). Nevertheless, law enforcement agents typically exert less control over a private home than a police station. Thus, it is relevant that Thompson was "on his own turf." *United States v. Rorex*, 737 F.2d 753, 755-56 (8th Cir. 1984) (no

custody where interrogation took place at suspect's place of business).

More important, however, is the fact that Thompson admittedly invited the Agents into his home and consented to the interview because as noted in *Miranda*, "custodial interrogation [means] questioning *initiated* by law enforcement officers." *Miranda*, 384 U.S. at 444. (emphasis added). Accordingly, courts have consistently found that a suspect was not in custody where the suspect volunteered statements or voluntarily arranged for questioning. *See United States v. Beckwith*, 425 U.S. 341, 96 S. Ct. 1612 (1976) (no custody where suspect invited agents into his house); *see also Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713 (1977) (no custody where suspect voluntarily came to police station to answer questions); *United States v. Hocking*, 860 F.2d 769, 772-73 (7th Cir. 1988) (no custody where suspect granted agents permission to enter his home and agreed to questioning); *Griffin*, 922 F.2d at 1351 (custody is less likely where a suspect voluntarily acquiesces to questions).

Moreover, while the Agents' accusations added coercive aspects to the questioning, there is no evidence that the Agents verbally abused Thompson or that they confronted him with evidence contradicting his protestations of innocence, aside from calling him "Dennis." Further, any coercion potentially created by the Agents' quotations from the Bible was obviated by the fact that, according to Thompson's own testimony, he initiated the discussion on that subject, actually retrieving the Bible himself. It is also significant that Thompson has not asserted any credible allegations that the Agents used intimidation, force, or threats of force, or that they displayed their weapons. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). As such, nothing in the record suggests that the Agents used "strong arm tactics" or pressure tactics to coerce a confession out of Thompson. *See United States v. Jones*, 630 F.2d 613, 615 (8th Cir. 1980).

While Agent Eley chaperoned Thompson whenever he left his living room, this restraint on his freedom of movement was not of a degree associated with a formal arrest. *See Griffin*, 922 F.2d at 1350 (noting that "[t]he bare fact of physical restraint does not itself invoke *Miranda*, only that restraint which is of a degree associated with formal arrest.") (internal citations and quotations omitted). Since Thompson's apartment was small and it appears there was no rear exit, Thompson must have understood that he had no effective means of escape other than through the living room where the Agents were seated. As a consequence, Thompson could only have interpreted Agent Eley's decision to accompany him into the kitchen as a non-coercive, officer safety precaution. That impression was reinforced when Agent Eley accompanied Thompson into a large closet in the living room and by Thompson's knowledge that the Agents were investigating an armed bank robbery involving an assault on a bank employee. Under these circumstances, whatever level of coercion may have been inherent in Agent Eley's escort, it insufficient to establish that Thompson was in custody.[7] *See United States v. Davis*, 778 F.2d 168, 170-171 (4th Cir. 1985) (no custody even though suspect chaperoned to restroom during questioning at police station since police officer's unwillingness to leave suspect alone was understandable).

Other circumstances which indicate that Thompson was not in custody include the fact that he selected both the location and the seating arrangement for the interview, *See United States v. Jones*, 630 F.2d 613, 615 (8th Cir. 1980) (no custody where suspect not subject to any police

---

[7] The court is mindful of *United States v. Madoch*, 149 F.3d 596, 601 (7th Cir. 1998) and *United States v. Renken*, 2004 WL 557364*8 (N.D. Ill. Mar. 22, 2004), in which suspects were in custody when law enforcement officers kept the suspects in view at all times. But in those cases, the suspects remained under the supervision of law enforcement officers even while performing the intimate tasks of showering, dressing, and breast feeding. *Id.* The suspects in those cases posed no threat of fleeing or to the safety of the supervising officers. As such, the suspects could have only interpreted the officers' presence as indicating that they were effectively, if not literally, under arrest.

commands); the interview was conducted by only two agents, *see United States* v. *Watson*, 1997 WL 24673 (N.D. Ill. Jan. 17, 1997) (finding that "two officers are not immediately suggestive of police control); and there is no evidence that he was prohibited from communicating with the outside world. *United States* v. *Jorgensen*, 871 F.2d 775, 779 (8th Cir. 1989) (no custody where suspect permitted to speak with his brother in private). In light of these facts, there is no basis to conclude that the police dominated the interview environment.

Finally, the fact that Thompson was not arrested at the conclusion of the interview is objective evidence of the Agents' subjective belief that Thompson was not in custody during the interview.

The lack of police domination over Thompson's home, the minimal and manifestly reasonable restrictions on his freedom of movement during questioning, and the absence of coercive interrogation techniques, together with the fact that Thompson consented to the interview, reflects an interview environment that no reasonable person could associate with formal arrest. Accordingly, Thompson was not entitled to *Miranda* warnings prior to making any statements to the Agents.

### B. The September 23, 2004 Interview Was Distinct from the September 22, 2004 Interview

Thompson also moves to suppress his September 23, 2004 post-*Miranda* warning confession on the grounds that it was the result of the two-step interrogation process invalidated by the Supreme Court in *Missouri* v. *Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L.Ed.2d 643 (2004). In light of this court's finding that Thompson's pre-warning in-home confession was not coerced or in violation of *Miranda*, Thompson's reliance on *Seibert* to invalidate his post-warning confession is unavailing.

*Seibert* involved the law enforcement's deliberate withholding of *Miranda* warnings from

11

a suspect already in police custody until the suspect confessed, followed by a *Miranda* warning and a post-warning repetition of the suspect's confession. *Seibert*, 542. at 611-12. *See also United States v. Stewart*, 388 F.3d 1079, 1086 (7th Cir. 2004). In that context, "*Miranda* warnings given mid-interrogation, after a suspect has already confessed, are generally ineffective as to any subsequent, postwarning incriminating statements." *Id.* *Seibert* was thus expressly aimed at invalidating the police interrogation technique known as "question first" which the Court believed was designed to circumvent and undermine *Miranda*. *Stewart*, 388 F.3d at 1087.

In this case, there is no evidence that the two-step interrogation was deliberately used in circumvention of *Miranda*. Indeed, unlike the suspect in *Seibert*, Thompson gave his initial pre-warning confession before he was in police custody and thus before he was entitled to *Miranda* warnings. In *Seibert*, the Court was concerned that mid-interrogation *Miranda* warnings given after a confession would be inadequate to "counter the probable misimpression that the advice that anything [the suspects] said could be used against [them] also applied to the details of the inculpatory statement previously elicited." *Seibert*, 542 U.S. at 616. Here, Thompson could not have been operating under any such misimpression because his initial inculpatory statement is in fact admissible. Therefore, the circumstances surrounding Thompson's pre-warning confession therefore do not implicate the concerns or interrogation techniques that undergirded the Supreme Court's decision in *Seibert*. While neither party cites to a case and the court is unable to find any authority addressing the admissibility of a suspect's post-warning confession given after he made an earlier pre-warning confession during a non-custodial interview, the court is satisfied that the two confessions are properly considered separate and distinct events requiring an independent, traditional

*Miranda* analysis.[8]

In this case, the *Miranda* analysis also requires the denial Thompson's motion to suppress his post-warning confession. Thompson was properly administered *Miranda* warnings at the beginning of his first custodial interview, which took place on September 23, 2004 at the FBI office. Thompson then signed a written waiver of his *Miranda* rights and provided the FBI with a second confession of his involvement in the LNB robbery. Thompson makes no allegations and there is no evidence to suggest that his waiver of his *Miranda* rights was unknowing or involuntary. Accordingly, there is no basis for this court to suppress Thompson's post-warning confession.

Even if *Seibert* applied to two-step interrogations in the absence of any *Miranda* violations, Thompson's post-warning confession on September 23, 2004 would still be admissible. Since *Seibert*, courts inquire into the change in time and circumstances between the pre-warning and post-warning confessions to evaluate the effectiveness of the mid-interrogation *Miranda* warning. *Stewart*, 388 F.3d at 1090. Here, Thompson's first confession was made in his own home on the night of September 22, 2004, whereas his second confession was made at least eight hours later on the morning of September 23, 2004 at the FBI office. During the time between the two confessions, Thompson slept in his own bed and had two separate phone conversations with his sister. In addition, Thompson's first confession was given to Agent Eley and Agent Lee, while his second confession was made to Agent Delide and Agent Ray, neither of whom knew about the earlier

---

[8] Indeed, *Seibert* only applies to deliberate two-step interrogations in which *Miranda* warnings are intentionally withheld until after the suspect confesses. In cases like *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L.Ed.2d 222 (1985), which involved police officers making a good-faith *Miranda* mistake, courts have continued to admit the post-warning confession unless it was "involuntary" despite the *Miranda* warning. *Stewart*, 388 F.3d at 1090. The Supreme Court's deferential treatment of two-step interrogations involving good-faith *Miranda* mistakes suggests that there is no reason to depart from traditional *Miranda* analysis where the two-step interrogation involves no *Miranda* violation whatsoever.

confession. The September 22, 2004 and September 23, 2004 interviews were conducted in different places, by different people, and more than eight or nine hours apart. Under these circumstance, there is no basis to conclude that the interviews were "two spates of integrated and proximately conducted questioning." *Seibert*, 542 U.S. at 613-14. Accordingly, Thompson's motion to suppress his September 23, 2004 statement is denied.

### C. The September 22, 2004 and September 23, 2004 Statements Were Voluntary

Thompson further moves to suppress his September 22, 2004 and September 23, 2004 statements on the grounds that both statements were not given voluntarily.

The voluntariness of a confession is evaluated on the basis of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A confession is voluntary if it "was not secured through psychological and physical intimidation but rather was the product of a rational intellect and free will." *United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir. 1994). "A statement is involuntary if it is extracted...[from] a suspect in response to a promise made by law enforcement personnel...[if] [t]he promise [is] sufficiently compelling to overbear the suspect's will in light of all the attendant circumstances." *United States v. Santillanes*, 728 F.Supp. 1358, 1360 (N.D. Ill. 1990) (quoting *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). In evaluating voluntariness, the court examines factors including the defendant's age, education, intelligence level, and mental state, whether the defendant was given his *Miranda* rights, the duration and nature of the questioning, and whether the defendant was punished physically. *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002).

The government has demonstrated that Thompson's will was not overcome during the interview on September 22, 2004. At the time of his confession, Thompson was a mature,

14

physically- fit adult with at least some college education. Thompson was interviewed in his living room by two agents who sat in seats selected by Thompson. Having previously been convicted of automobile theft, Thompson had prior experience dealing with law enforcement. There is no evidence that Thompson was subjected to physical abuse or that he was denied the opportunity to go to the bathroom or to get refreshments. There is also no evidence that Thompson was subjected to verbal abuse during the questioning. At most, the Agents raised their voice on a few occasions. The mere fact that the interview lasted approximately three hours is insufficient to establish that Thompson's will was overborne. *See Hocking*, 860 F.2d at 774-75 (finding suspect's statement was voluntary even though interview lasted three hours). The government has thus demonstrated by a preponderance of the evidence that Thompson's September 22, 2004 confession, while unwarned, was voluntary.

Thompson's confession on September 23, 2004 was also voluntary. Prior to making a statement, Thompson was properly administered *Miranda* warnings and then signed a written waiver of his *Miranda* rights. Thompson was interviewed by two agents who did not know the details of the LNB robbery and who conducted very little questioning before Thompson confessed. There is again no evidence that Thompson was subjected to any physical, verbal or psychological abuse during the interview. Accordingly, the September 23, 2004 confession was voluntary.

Therefore, the court denies Thompson's motion to suppress his September 22, 2004 and September 23, 2004 confessions. As a result there is no basis to quash Thompson's arrest.

## CONCLUSION

For the reasons stated above, Thompson's Motion to Suppress Statements and Quash Arrest (#41) is denied.

Dated: March 21, 2005       Enter: _____
                                   JOAN HUMPHREY LEFKOW
                                   United States District Judge